*NOT FOR PUBLICATION*

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| P.F. and K.F. o/b/o G.F., | |
| Plaintiffs, | Civil Action No. 21-19315 (FLW) |
| v. | **OPINION** |
| OCEAN TOWNSHIP BOARD OF EDUCATION, | |
| Defendant. | |

**WOLFSON, Chief Judge:**

Presently before the Court are cross-Motions for Summary Judgment filed by P.F. and K.F., on behalf of their daughter G.F. (together, "Plaintiffs") and Ocean Township Board of Education ("Defendant" or the "District"). The motions arise out of Plaintiffs' appeal of Administrative Law Judge Jeffrey N. Rabin's ("ALJ") decision to dismiss Plaintiffs' due process petition, which claimed that Defendant violated G.F.'s right to a free, appropriate public education ("FAPE") under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.* For the reasons that follow, the District's Motion for Summary Judgment is **GRANTED**, and Plaintiffs' Motion for Summary Judgment is **DENIED**.

## I.   BACKGROUND

### A.   The Individuals with Disabilities Education Act

Before I recount the relevant facts, an overview of the statutory framework is necessary. The IDEA, 20 U.S.C. § 1401 *et seq.*, is designed "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment,

and independent living[.]" 20 U.S.C. § 1400(d)(1)(A). The IDEA requires states that receive federal education funding to provide every disabled child with a FAPE. *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 993 (2017) (citing 20 U.S.C. § 1400, *et seq.*). A FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 268–69 (3d Cir. 2012) (internal quotation marks omitted). While a state is not required to maximize the potential of every disabled child, it must provide more than *de minimus* progress each year. *Endrew F*, 137 S. Ct. at 1001. Accordingly, school districts must offer an Individualized Education Program ("IEP") that is "reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential and individual abilities." *K.D. ex rel. Dunn v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 254 (3d Cir. 2018) (quoting *Ridley Sch. Dist.*, 680 F.3d at 269).

"An IEP consists of a specific statement of a student's present abilities, goals for improvement of the student's abilities, services designed to meet those goals, and a timetable for reaching the goals by way of the services." *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 557 (3d Cir. 2010). It must not be a "form document." *Endrew F.*, 137 S. Ct. at 999. Thus, an IEP "turns on the unique circumstances of the child for whom it is created." *Id.* at 1001. For a child integrated into a regular classroom, an IEP is usually "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Id.* at 999 (quoting *Bd. of Ed. of Hendrick Hudson Ctr. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 203-04 (1982)). And while parents often play a role in the development of an IEP, they do not have a right to compel a school district to provide a specific program or employ specific methodology in educating a student. *See Ridley Sch. Dist.*, 680 F.3d at 269, 278.

New Jersey has enacted legislation to ensure that students with disabilities can access a FAPE as required by the IDEA. To be eligible for special education in New Jersey, a student must satisfy three requirements: (1) the student must be found to have one or more of the enumerated disabilities; (2) the disability must adversely affect the student's educational performance; and (3) the student must be in need of special education and related services. N.J.A.C. 6A:14-3.5(c). The enumerated disabilities include a specific learning disability ("SLD"), which exists "when a severe discrepancy is found between the student's current achievement and intellectual ability" in eight academic areas: basic reading skills, reading comprehension, oral expression, listening comprehension, mathematical calculation, mathematical problem solving, written expression, and reading fluency. N.J.A.C. 6A:14-3.5(c)(12). The list of qualifying disabilities also includes "other health impairment," which is defined as follows:

> [A] disability characterized by having limited strength, vitality, or alertness, including a heightened alertness with respect to the educational environment, due to chronic or acute health problems, such as attention deficit hyperactivity disorder, a heart condition, tuberculosis, rheumatic fever, nephritis, asthma, sickle cell anemia, hemophilia, epilepsy, lead poisoning, leukemia, diabetes, or any other medical condition, such as Tourette Syndrome, that adversely affects a student's educational performance. A medical assessment documenting the health problem is required.

N.J.A.C. 6A:14-3.5(c)(9).

The qualifying student's IEP must be developed by an IEP team and be reviewed at least annually. N.J.A.C. 6A:14-3.7(b), (i). Additionally, students classified as eligible for an IEP must be reevaluated every three years, or sooner if conditions warrant, or if the student's parent or teacher requests a reevaluation. N.J.A.C. 6A:14-3.8(a).

The IDEA provides mechanisms for an aggrieved party to submit a complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6)(A).

Initially, a party may bring a complaint to challenge the adequacy of an IEP through "an administrative 'impartial due process hearing.' " *Ridley Sch. Dist.*, 680 F.3d at 269 (quoting 20 U.S.C. § 1415(f)). "In New Jersey, this process entails filing a complaint and request for a due process hearing with the New Jersey Department of Education ("NJDOE")." *Estate of S.B. ex rel. Bacon v. Trenton Bd. of Educ.*, No. 17-7158, 2018 WL 3158820, at *2 (D.N.J. June 28, 2018) (quoting N.J.A.C. 6A:14-2.7(c)). A party aggrieved by the outcome of the due process hearing "shall have the right to bring a civil action with respect to the complaint presented ... in a district court of the United States, without regard to the amount in controversy." 20 U.S.C § 1415(i)(2)(A). The party challenging the administrative decision in district court "bears the burden of persuasion ... as to each claim challenged." *Ridley Sch. Dist.*, 680 F.3d at 270.

    **B.**    **Factual Background**

The facts of the case are set forth in the ALJ's decision, the District's Statement of Undisputed Material Facts (ECF No. 8-1), and Plaintiffs' Statement of Undisputed Material Facts (ECF No. 9-2). The following facts are undisputed unless otherwise noted.

P.F. and K.F. are the parents of G.F., a minor born on January 2, 2012. (Def. SUMF, ¶¶ 1-2.) G.F. has attended school in the Ocean Township School District since the 2017-2018 school year, when she entered kindergarten. (*Id.* at ¶ 4.) At the beginning of first grade, in October 2018, G.F.'s parents requested that a Child Study Team ("CST") evaluate G.F. because they were concerned about her reading skills. (*Id.* at ¶ 5; Pl. SUMF, ¶ 14.) At an initial planning meeting, the CST proposed to complete educational, psychological, and social history assessments to determine G.F.'s eligibility for special education and related services.[1] (Def. SUMF, ¶ 6.)

---

[1]    Plaintiffs requested an occupational therapy evaluation of G.F.; however, after speaking with G.F.'s teachers, the CST determined that such an evaluation was not warranted. (Def. SUMF at ¶¶ 24-25.)

The CST conducted the educational evaluation of G.F. on October 29, November 2 and 5, 2018. (*Id.* at ¶ 10.) As part of the educational evaluation, G.F. was administered the Woodcock-Johnson Tests of Achievement IV (W-J IV), a standardized measure used to assess her current achievement level in seven of the eight areas identified in the New Jersey special education regulation that can form the basis for eligibility for special education under the category of specific learning disability. (*Id.* at ¶ 11.) G.F. performed in the average to low-average range in basic reading skills; reading comprehension (as measured by the passage comprehension subtest); oral expression; listening comprehension; mathematical calculation; mathematical problem solving; and reading fluency (as measured by the oral reading subtest). (*Id.* at ¶ 12.) Specifically, G.F. received scores ranging from 85 in reading fluency (low average) to 100 in oral expression (average) and 100 in mathematical calculation (average). (*Id.*) Also, as it relates to G.F.'s reading ability, she received scores of 87 (low average) and 88 (low average) in basic reading skills and reading comprehension, respectively. (*Id.*) While the evaluator did not assess G.F.'s written expression because of her age and level of schooling at the time of the test, G.F. performed in the low average to average range on two writing subtests of the W-J IV that were administered as part of the educational evaluation. (*Id.* at ¶ 13-14.)

During the same time as the CST's educational evaluation of G.F., her parents also provided the District with a report obtained privately from Lisa Kestler, Ph.D., of the Dyslexia Center of Princeton. (*Id.* at ¶ 20; Pl. SUMF, ¶ 24.) Dr. Kestler's report estimated G.F's intellectual ability to fall in the low average range, and diagnosed G.F. with dyslexia. (Def. SUMF, ¶¶ 20-21; Pl. SUMF, ¶ 27.)[2] Dr. Kestler's report defines dyslexia as being "characterized by a reduced ability to integrate symbols and sounds, resulting in difficulty developing and using work attack skills to

---

[2]     While Defendant claims that the report was reviewed and considered by the CST, Plaintiffs disagree.

decode single, unknown words." (Pl. SUMF, ¶ 34.) Dr. Kestler also provided the following

recommendations for G.F.:

> Remediating dyslexia requires a minimum of 200 minutes per week of intensive, individualized instruction that addresses cognitive processing deficits as well as improving reading, spelling, and writing.
>
> Enroll [G.E.F.] in a research-based, data-driven dyslexia remediation program that integrates Orton-Gillingham-based methodology with developmentally appropriate remediation for the underlying cognitive processing deficits. These are the phonological and visual-motor weaknesses, as well as mild visual memory weaknesses, identified within this report that contribute to [G.E.F.]'s dyslexia.

(*Id.* at ¶ 35.)

As for the psychological evaluation, G.F. was administered the Wechsler Intelligence Scale

for Children – Fifth Edition. (Def. SUMF, ¶ 15.) G.F. obtained a Full-Scale IQ score of 91, which

is at the low end of the average range. (*Id.*) Following the educational and psychological

evaluations, all of G.F's achievement scores obtained through the CST's educational assessment

and G.F.'s IQ were entered into the UTAH Estimator, a computer program used to compare the

educational score with the student's IQ score. (Def. SUMF, ¶ 18; Pl. SUMF, ¶ 52.) According to

the testimony of Jessica Olson, the CST's Learning Disabilities Teacher Consultant, the UTAH

Estimator must demonstrate a 93% confidence level of a severe discrepancy between the child's

functioning and capability for a determination that the student has a learning disability. (Pl. SUMF,

¶ 54.) Because the UTAH Estimator demonstrated a 74% confidence level with respect to G.F.,

Ms. Olson testified that there was not a meaningful discrepancy between her academic

performance and her intellectual ability. (*Id.* at ¶ 56.) Thus, according to the UTAH Estimator, the

data compiled by the CST did not support the presence of a learning disability in G.F. (Def. SUMF, ¶ 19.)[3]

Lastly, the social assessment was performed by Rachel Gerstein, a social worker employed by Defendant and a member of the CST. (Pl. SUMF, ¶ 37.) The social assessment consisted of a parent interview, a record review, student observation, and a student interview. (*Id.* at ¶ 38.) While Ms. Gerstein's evaluation indicated that G.F. had difficulties with decoding, reading comprehension, and retention, neither she, nor any of G.F.'s teachers linked those deficiencies to dyslexia. (*Id.* at ¶ 40.) Rather, Ms. Gerstein observed G.F. during a reading lesson in her general education first grade class and found that G.F. was able to follow along with the class lesson, able to work with a partner appropriately during a collaborative assignment, and did not stand out from her general education peers. (ALJ Decision, 4.)

On December 3, 2018, Defendant held an eligibility meeting, at which the CST evaluations and test data regarding G.F. were shared and reviewed with Plaintiffs. (Def. SUMF, ¶ 26.) The CST found that G.F.'s difficulties with coding, decoding, and reading comprehension did not adversely affect her educational performance, and therefore, did not create an educational impact of a disabling condition on her education. (*Id.* at ¶ 27.) Accordingly, the CST determined that based on the observation of G.F. in class, information from her teachers, report cards, school performance, and the results of the CST and private evaluations, G.F. did not have a specific learning disability and was not eligible for special education and related services. (*Id.* at ¶ 29.)

---

[3]     Plaintiffs do not dispute the UTAH Estimator's methodology or its conclusions. Rather, they argue that Defendant improperly denied G.F. special education and related services based <u>solely</u> on the results of the UTAH Estimator.

On December 4, 2018, Defendant formally determined that G.F. was ineligible ("Eligibility Determination") for special education and related services. (Pl. SUMF, ¶ 63.) In part, Defendant stated that:

> As a result of the evaluation and the initial eligibility determination meeting, the district is proposing that [G.F.] is not eligible for special education and related services . . . [u]pon completion of the most recent evaluations, the district finds that [G.F.] does not meet the criteria for eligibility of special and related service. [G.F.]'s parents have provided an outside evaluation from The Dyslexia Center of Princeton; this has been considered by the IEP team. In addition, [G.F]'s parents have requested that an Occupational Therapy Evaluation be conducted; this is rejected by the IEP team.

(*Id.* at ¶ 64.) Shortly following Defendant's Eligibility Determination, Intervention and Referral Services (I&RS) sought to provide G.F. with general education support. (Def. SUMF, ¶¶ 30-32.) For the 2018-2019 school year, this included small group decoding and encoding instruction up to three times per week and small group reading fluency support twice per week. (*Id.* at ¶ 32.) Additionally, a 504 Plan was developed for G.F. in June 2019, after Plaintiffs submitted proof that she had been diagnosed with Attention Deficit Hyperactivity Disorder (ADHD), and the District implemented reasonable accommodations in that regard.

## C.   Administrative Proceedings and Proceedings in this Court

On December 20, 2018, Plaintiffs sought mediation related to Defendant's determination that G.F. was ineligible for special education and related services. (Pl. SUMF, ¶ 1.) Following an unsuccessful mediation, Plaintiffs' request was converted to a due process hearing. (*Id.* at ¶ 2.) Following a three-day hearing on October 15, 2019;[4] October 16, 2019; and January 29, 2020, the

---

[4] At the hearing on October 15, 2019, oral arguments were heard on the parties' cross-motions to exclude testimony and certain documents. Petitioners' motion, seeking to exclude expert testimony for any witness lacking an expert report, was denied. Respondent's motion to exclude testimony from any witness other than Jennifer Manzo, due to petitioners' failure to provide witness summaries, was granted with respect to all witness except Dr. Kestler, who was permitted to testify solely as a fact witness concerning the private evaluation she conducted of G.F. in 2018.

ALJ dismissed Plaintiff's due process petition in a written decision dated July 28, 2021, finding that Defendant had appropriately determined that G.F. did not meet the criteria required for special education and related services eligibility. (Def. SUMF, ¶ 37; Pl. SUMF, ¶¶ 3-5.)[5] The following five individuals testified at the hearing: Dr. Kestler, Ms. Gerstein, Ms. Olson, Brianne Brannigan, and Jennifer Zona. With respect to Dr. Kestler, the ALJ only permitted her to testify as a fact witness, after finding that Plaintiffs had not provided the District with notice of Dr. Kestler's testimony, nor did they provide a witness summary, prior to the due process hearing, in violation of New Jersey's five-day rule, N.J.A.C 1:6A–10.1(c). As such, Dr. Kestler's testimony was limited to the private evaluation she conducted of G.F. in 2018. On the other hand, the ALJ found Ms. Zona, the District's Assistant Superintendent of Special Services, to be an expert in special education, learning disabilities, and eligibility for special education; Ms. Brannigan to be an expert in reading instruction; and Ms. Olson to be an expert in educational testing, learning disabilities, and special education eligibility determinations. Finally, as to Ms. Gerstein, while the ALJ found her to be "unsettled," and at times, defensive and evasive, she testified regarding the social history assessment of G.F. that she conducted as part of the initial CST evaluation. Although she did not possess the qualifications to address Dr. Kestler's report on a technical basis, the ALJ noted that Ms. Gerstein was credible when discussing G.F.'s academic background in the District based on her observations as a school social worker and case manager for G.F.

In dismissing Plaintiff's due process petition, the ALJ first considered whether Defendant improperly relied on a single criterion—the results of the UTAH Estimator—when determining G.F.'s special education eligibility. (ALJ Decision, 15-17.) Answering that question in the

---

[5]     In addition, prior to the ALJ's dismissal, he denied Plaintiffs' motion to reopen the record to admit evidence showing that the CST deemed G.F. eligible for special education and related services in February 2021. (Pl. SUMF, ¶ 4.)

negative, the ALJ found that Defendant performed a "battery of assessments" to measure G.F.'s general learning aptitude and level of academic achievement. (*Id.* at 17.) The ALJ emphasized the District's "Eligibility Determination," which stated that "the team reviewed current work samples, teacher observations, and input from the general education teacher. . . reviewed and considered the evaluation provided from The Dyslexia Center of Princeton." (*Id.* at 17.) Next, the ALJ considered the evidence in the record, noting that Plaintiffs "ask[] this tribunal to substitute its analysis of whether G.F. had a [specific learning disability] for the analysis of Defendant, by asking that G.F. be deemed eligible for receive special education and related services and compensatory education[.]" (*Id.* at 20.) In that regard, the ALJ concluded that Plaintiffs failed to satisfy the three prong requirement of N.J.A.C. 6A:14-3.5(c), because "[Defendant's] evaluation of academic achievement and intellectual testing confirmed that G.F. did not have a [specific learning disability], Plaintiffs failed to demonstrate an adverse impact to G.F.'s educational performance as a result of her alleged dyslexia, and G.F. was showing progress in the general education setting offered by Defendant. (*Id.* at 21.) Thus, having found that Plaintiffs did not meet all three prongs of the test for special education eligibility, the ALJ concluded that Defendant had properly determined that G.F. was ineligible for special education and related services. (*Id.* at 24.)

On October 22, 2021, Plaintiffs filed this action, and on April 28 and 29, 2022, the parties filed their respective cross-motions for summary judgment. (ECF Nos. 8 and 9.)

## II.   **STANDARD OF REVIEW**

The standard of review "under which this Court considers an appeal of a state administrative decision under the IDEA differs from that governing the typical review of summary judgment." *M.A. ex rel. G.A. v. Voorhees Tp. Bd. of Educ.,* 202 F. Supp. 2d 345, 359 (D.N.J. 2002), *aff'd*, 65 Fed.Appx. 404 (3d Cir. 2003) (internal citations and quotations omitted). To that

end, the Third Circuit has instructed district courts to apply a "modified version of *de novo* review" to cases brought under the IDEA. *Munir*, 723 F.3d at 430. Under this standard, although "the District Court must make its own findings by a preponderance of the evidence, the District Court must also afford 'due weight' to the ALJ's determination." *Mary T.*, 575 F.3d at 241 (citation omitted). "The 'due weight' standard requires the court to consider the factual findings from the administrative proceedings *prima facie* correct and, if the court fails to adopt those findings, it must explain its reasons for departing from them." *Id.* (quoting *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004)) (internal quotations omitted). The purpose of the "due weight" standard is to prevent the courts from imposing their own "view of preferable educational methods on the states." *Rowley*, 458 U.S. at 207. Nonetheless, the district court's review over questions of law and the ALJ's application of legal precepts is plenary. *See Carlisle Area Sch. v. Scott P. By & Through Bess P.*, 62 F.3d 520, 528 n.3 (3d Cir. 1995); *D.B. v. Ocean Twp. Bd. of Educ.*, 985 F. Supp. 457, 500 (D.N.J. 1997), *aff'd*, 159 F.3d 1350 (3d Cir. 1998).

## III.   <u>DISCUSSION</u>

Plaintiffs' motion for summary judgment challenges the ALJ's decision on three grounds: (1) his failure to reopen the record to admit additional evidence related to the District's finding that G.F. was eligible for special education for the 2020-2021 school year, (2) the ALJ's conclusion that the District's Eligibility Determination was proper in light of the evidence in the record, and (3) the ALJ's credibility determinations with respect to four witnesses: Jessica Olson, Brianne Brannigan, Jennifer Zona, and Dr. Lisa Kestler. Defendant's cross-motion for summary judgment, on the other hand, maintains that the ALJ correctly determined that G.F. did not meet the requirements for special education and related services pursuant to the IDEA and N.J.A.C. 6A:14–3.5.

I will begin by evaluating the ALJ's conclusion, based on the record before him, that the District's Eligibility Determination was proper, as well as consider the credibility determinations made in connection with the four witnesses identified above. Finally, I will consider the ALJ's denial of Plaintiffs' motion to reopen the record, and the relevancy of that evidence on the underlying proceeding.

### A.   G.F.'s Eligibility for Special Education and Related Services

As set forth in the above discussion of the statutory framework of the IDEA, *supra*, the presence of a disability, alone, does not mean a child is necessarily eligible for special education and related services. Rather, the definition of a "child with a disability" under the IDEA requires a disabling condition and a resulting need for special education and related services to address same. 20 U.S.C. § 1401(3). Indeed, "[t]he Third Circuit has noted that the IDEA is written in the conjunctive and coverage thereunder requires a showing that a student is 1) a child with a disability and 2) needs special education and related services." *J.Q. v. Wash. Twp. Sch. Dist.*, 92 F. Supp. 3d 241, 246 (D.N.J. 2015) (quoting *D.S. v. Neptune Twp. Bd. of Educ.*, 264 F. App'x 186, 189 (3d Cir. 2008) ("Written in the conjunctive, the statute should not be read to protect children with an impairment but not requiring special education.")). Also as discussed above, New Jersey has enacted legislation to ensure that students with disabilities can access a FAPE as required by the IDEA. To be eligible for special education in New Jersey, a student must satisfy three requirements: (1) the student must be found to have one or more of the enumerated disabilities; (2) the disability must adversely affect the student's educational performance; and (3) the student must be in need of special education and related services. N.J.A.C. 6A:14-3.5(c).

1. *Qualifying Disability*

First, Plaintiffs challenge the ALJ's conclusion that the CST properly determined that G.F. did not have a SLD. In support of its position, Plaintiffs raise two arguments: (1) that Dr. Kestler diagnosed G.F. with dyslexia, and that diagnosis was unrefuted, and (2) the District improperly relied solely on the UTAH Estimator in determining that G.F. did not have a SLD. Specifically, as to their second argument, Plaintiffs maintain that Ms. Zona and Ms. Olson both testified that following the results of the UTAH Estimator, the District "did not move forward on assessing" whether G.F's purported learning disability adversely affected her educational performance and necessitated special educational services. In response, the District maintains that a medical diagnosis of dyslexia does not automatically produce a finding that a student has a SLD. Rather, according to the District, the New Jersey Administrative Code provides that a SLD may only be found when there is a significant discrepancy between the student's achievement and intellectual ability in one of eight enumerated areas, *see* N.J.A.C. 6A:14-3.5(c)12.i, or through a response to intervention methodology. N.J.A.C. 6A:14-3.5(c)12.ii. As it pertains to the District's consideration of the UTAH Estimator results, the District maintains that G.F.'s Eligibility Determination expressly states that the CST considered multiple assessments, input from teachers and parents, and observations of G.F. in finding her ineligible for special education and related services. I agree with the District's position that based on the record before the ALJ, G.F. did not have a SLD as dictated by New Jersey law.

Here, at the outset, the mere fact that Plaintiffs obtained a private report from Dr. Kestler which diagnosed G.F. with dyslexia, does not *ipso facto* mean that she has a SLD. In that regard, to the extent that Plaintiffs rely on an administrative law judge's decision in *S.B. and H.B. on behalf of G.B. v. East Greenwhich Twp. Board of Education*, OAL Dkt. No. EDS 13660-18

(October 15, 2019), to support their position that Dr. Kestler's report was sufficient to find G.F. disabled pursuant to the IDEA and N.J.A.C. 6A:14-3.5(c), I find that case non-binding and distinguishable. In that case, the school district did not dispute a private diagnosis that a student had Autism Spectrum Disorder, and, based on that unrebutted diagnosis, the administrative law judge found the student to be disabled. Notably, however, autism and dyslexia are treated differently under the New Jersey Administrative Code as it relates to whether a student is disabled. For a student to meet the categorical criteria for autism, an assessment by a certified speech-language specialist and an assessment by a physician trained in neurodevelopmental assessment are required. N.J.A.C. 6A:14-3.5(c). Unlike autism, however, such specific assessments by trained and accredited professionals are not required to find that a student's dyslexia is a SLD. *Id.*

Rather, SLD is defined as "a disorder in one or more of the basic psychological processes involved in understanding or using language, spoken or written, that may manifest itself in an imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations, including conditions, such as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia." N.J.A.C. § 6A:14-3.5(c)(12) (emphasis added); *see also* 34 C.F.R. § 300.8(c)(10)(i). Although the definition of SLD includes dyslexia as an example, that diagnosis alone does not meet the categorical criteria for a specific learning disability to be found. Rather, N.J.A.C. § 6A:14-3.5(c)(12) provides that two methods exist to determine whether a child has a SLD. *V.M. ex rel. B.M. v. Sparta Twp. Bd. of Educ.*, 12-892, 2014 WL 3020189, at *4 (D.N.J. July 3, 2014). "The first is the 'severe discrepancy' approach, by which [the district] determine[s] whether there is a 'severe discrepancy ... between the student's current achievement and intellectual ability in one or more" listed areas (for example, reading comprehension). *Id.* (quoting N.J.A.C. § 6A:14-3.5(c)(12)(i)). "Alternatively, the [district] may also 'utilize[e] a response to

scientifically based interventions methodology.' " *Id.* (citing N.J.A.C. § 6A:14-3.5(c)(12)(ii)). Either method is permissible, and here, the District chose the severe discrepancy approach. *Id.* at *4 n.2; *see also* 34 C.F.R. § 300.307(a).

Applying the severe discrepancy approach, I find that the District, as it was required to do, considered a variety of assessments in addition to the results of the UTAH Estimator, when making its Eligibility Determination. *See V.M.*, 2014 WL 3020189, at *4 ("New Jersey's regulations go one step farther, providing that '[c]lassification shall be based on all assessments conducted ....'"). First, in a memorandum dated September 12, 2018, from Ms. Zona, the District's Assistant Superintendent of Special Services, to the District's CST members, special education supervisors, building principals, and director of school counselors, the District provided its criteria for determining the presence of a SLD. (R-33). Specifically, the District's policy states that

> [a] specific learning disability in one of the following areas: Reading Comprehension, Basic Reading Skill, Reading Fluency, Oral Expression, Listening Comprehension, Math Calculation, Math Problem Solving, or Written Expression will be determined as follows:
>
> - a discrepancy of at least 1.5 standard deviation (22 points) between cognitive performance and achievement on current individualized standardized measures;
>
> - in addition to above, the CST must determine that the disability adversely affects the student's educational performance and that the student is in need of special education and related services;
>
> - in addition to above, the CST must determine that the deficit is not due to lack of instruction or limited English proficiency. The CST must also rule out the impact of deficits with vision, hearing, motor, cognitive deficits, emotional disturbance, or environmental, cultural, or economic disadvantage in finding the severe discrepancy in the testing results to evidence a specific learning disability.

(R-33). Most significantly, the District-wide policy also provided that "[i]n accordance with federal regulations, the numerical "severe discrepancy" cut-offs will <u>not be the sole criterion for</u>

determining eligibility. (*Id.*) (emphasis added). Rather, in addition to the above criteria, the District explained that "Child Study Teams will continue to consider additional data from classroom observations in determining the adverse effects of a learning problem on a student's educational performance." (*Id.*) (emphasis added). Second, the District's Eligibility Determination confirmed that, in accordance with its District-wide policy, "a complete battery of assessments were administered to measure [G.F.'s] general learning aptitude and current academic achievement." (R-12). Indeed, the Eligibility Determination explained that in addition to the more formal assessments performed by the CST, the District also considered "current work samples, teacher observations, and input from the general education teacher." (*Id.*) Further, the District stressed that it reviewed the report provided by Plaintiffs from Dr. Kestler and the Dyslexia Center of Princeton. (*Id.*) Thus, Plaintiffs' argument that the CST found G.F. ineligible based solely on a numerical assessment using the UTAH Estimator is baseless and wholly lacks support from the record. Put simply, Plaintiffs have not shown that, based on the record before the ALJ, G.F. has a disability that qualifies her for special education and related services. Plaintiffs, aside from their own self-serving insistence, provide no evidence to rebut the District's representation that it considered various assessments and data.

2. *Adverse Impact on Educational Performance and Need for Special Education*

Even assuming G.F. had a SLD, the evidence in the record nonetheless supports the ALJ's findings under the second and third prongs of N.J.A.C. § 6A:14-3.5(c), that the disability did not adversely affect her educational performance such that she needed special education and related services. *See* N.J.A.C. § 6A:14-3.5(c). With respect to prong two, which concerns the adverse impact of the disability on the student's educational performance, "when students' academics do not decline ... that consistency is usually found to signal that their disability does not adversely

affect their educational performance." *M.S. v. Randolph Bd. of Educ.*, No. 18-13029, 2019 WL 4785742, at *9 (D.N.J. Sept. 30, 2019), *reconsideration denied*, 2020 WL 5105231 (D.N.J. Aug. 31, 2020).

Critically, however, Plaintiffs do not point to any evidence in the record before the ALJ to demonstrate that G.F.'s alleged disability adversely affected her educational performance. Instead, they rely only on documents outside the record, such as certain *post hoc* documents created in connection with the District's determination that G.F. required special education for the 2020-2021 school year. As discussed in more detail below, *infra*, these *post hoc* documents were not admitted into evidence, and therefore, were not considered by the ALJ.

Rather, the record before the ALJ at the due process hearing reveals that G.F. was, in fact, making progress in her general education program, and therefore, any purported disability did not adversely affect her educational performance. Indeed, her 2018-2019 report card showed that she was performing at least satisfactorily in all subject areas. (R-26.) G.F. received a mixture of satisfactory or good marks in English Language Arts Literacy, including reading, writing, listening and speaking, and language; Mathematics, including operations and algebraic thinking, numbers and operations, measurement and data, and geometry; Social Studies; and Science. (*Id.*) Examining her performance in English Language Arts Literacy in particular, G.F. showed progress throughout the year. (*Id.*) For example, although her teacher indicated that G.F. needed improvement identifying and recognizing "sight words" in the first marking period, that was not an area of concern in the second, third, or fourth marking period. (*Id.*) Similarly, in the third marking period, her teacher identified that G.F. needed to improve her "comprehension skills." (*Id.*) That area, however, was not identified as an area of concern in the fourth marking period, which suggests an improvement. (*Id.*) Additionally, as the ALJ noted, the record demonstrates that "G.F. was able to

follow along with her first-grade class lessons, she worked with a partner appropriately during a collaborative assignment, did not stand out from her general education peers, and was making sufficient progress in her general education program to keep up with her peers." (ALJ Decision, 21-22.) Accordingly, Plaintiffs have not shown that a disability adversely affected G.F.'s academic performance. *See Ridley*, 680 F.3d at 272 (finding that the child did not have a disability where "although areas of weakness were found, [the child's] academic skills were generally considered to be in the average range").

Finally, the third requirement for finding that a student qualifies for special education is whether that student "needs special education and related services" as a result of a disability. N.J.A.C. 6A:14-3.5(c). "Persuasive authority instructs that a child 'needs special education' if he cannot attain educational standards in the general education environment." *J.M. v. Summit City Bd. of Educ.,* 19-00159, 2020 WL 6281719, at *10 (D.N.J. Oct. 27, 2020), *aff'd*, 39 F.4th 126 (3d Cir. 2022) (citing *Durbow v. Cobb Cnty. Sch. Dist.*, 887 F.3d 1182, 1194–95 (11th Cir. 2018)). Here, to the extent that Plaintiffs rely on Dr. Kestler's report to support a finding that G.F. needs special education, that argument is unpersuasive. Dr. Kestler's report contains no conclusion or recommendation that G.F. should be found eligible for special education and related services, or that she required a special education program. Rather, Dr. Kestler simply recommended that G.F. "enroll . . . in a research-based, data-driven dyslexia remediation program." As the ALJ noted, however, Dr. Kestler did not recommend that such a remediation program be provided by the District, nor that it be provided through an IEP. Moreover, while Dr. Kestler's report also set out suggestions for specific educational accommodations and/or modifications for G.F., those suggestions were implemented by the District through its general educational program. Specifically, Dr. Kestler recommended that G.F. should be provided with Orton-Gillingham-based

phonics and fluency instruction on a daily basis. Indeed, no evidence exists in the record, however, to suggest that Orton-Gillingham instruction could only be provided if G.F. was determined to be eligible for special education. In fact, the District provided G.F. with small group instruction in phonics and fluency which incorporated Orton-Gillingham-based methodology. (R-14; R-16). Moreover, in that same regard, the record indicates that the District provided appropriate support to G.F. through I&RS after the Eligibility Determination, and it later instituted a 504 Plan when G.F. was diagnosed with ADHD. (October 16, 2019 Hearing Transcript, 39:4-40:6; R-25). Accordingly, because Plaintiffs did not satisfy the three requirements demonstrating that G.F. qualifies for special education, the Court finds that the District's Eligibility Determination was appropriate.

### B.     The ALJ's Determinations Regarding Witness Qualifications and Credibility

Next, Plaintiffs challenge the ALJ's decision to credit the testimony of certain witnesses, including Ms. Zona, Ms. Olson, and Ms. Brannigan, and discredit the testimony of Dr. Kestler. (Pl. Mov. Br., 34-41.) In addition, although Plaintiffs do not characterize their arguments in this fashion, they also challenge the ALJ's determinations as to the qualifications of certain witnesses. First, as to Ms. Zona, the District's Assistant Superintendent of Special Service, the ALJ accepted her as an expert in special education, learning disabilities, and eligibility for special education. (ALJ Decision, 7.) Finding Ms. Zona credible, the ALJ reasoned that she was deliberate and "careful with her answers," reviewed the documents she was being questioned about, and "appeared very knowledgeable and experienced." (*Id.* at 11.) Specific to her knowledge and experience, the ALJ explained that Ms. Zona was responsible for the District's special education programs, which includes approximately 800 special education students, and she has worked on the eligibility for special education in over 1,000 cases. (*Id.*) On this motion, however, Plaintiffs

claim that Ms. Zona was an "obstructionist" witness who the ALJ "was required to direct to answer the questions of [Plaintiffs'] counsel," and that she misinterpreted the procedures of the Administrative Code by finding G.F. ineligible for special education and related services based solely on the UTAH Estimator. (Pl. Mov. Br., 34-35.) In addition, Plaintiffs claim that she was not qualified to diagnose dyslexia or challenge Dr. Kestler's dyslexia diagnosis because she lacks a Ph.D.

Similarly, the ALJ accepted Ms. Olson, the District's Learning Disabilities Teacher Consultant, as an expert in educational testing, learning disabilities, and special education eligibility determinations. The ALJ found her to be a "highly credible witness." (ALJ Decision, 10.) The ALJ emphasized that Ms. Olson was "highly-qualified and knowledgeable," answered questions "calmly, skillfully and with great detail," and "fluently described the tests administered to G.F." (*Id.*) Plaintiffs claim, however, that like Ms. Zona, Ms. Olson was an "obstructionist" witness and that she incorrectly testified that Defendant could deny special education eligibility based solely on the UTAH Estimator. (Pl. Mov. Br., 35.) In addition, Plaintiffs argue that the ALJ should not have found Ms. Olson credible, because she "admitted her assessment was inconsistent with the Dyslexia Center of Princeton's dyslexia diagnosis of [G.F.]," "disagreed that the evaluations of [G.F.] which showed limited performance were consistent with the dyslexia diagnosis," and stated that "using pictures is not easier than reading words to an individual who is struggling to master reading concepts." (*Id.*)

I first address the ALJ's decision to admit Ms. Zona as an expert witness. As a threshold matter, neither party identifies the standard of review that courts use to assess such decisions by an administrative law judge at a due process hearing. Instead, without explanation or support, the parties treat Plaintiffs' challenge to Ms. Zona's qualifications akin to credibility or reliability

determinations. Although murky, case law on this issue does appear to suggest that deference is shown to an administrative law judge's witness qualification determinations, so long as adequate support for those determinations exists in the record. *Bd. of Educ. of Montgomery Cnty. v. J.M.*, No. 18-00840, 2019 WL 1409687, at *8 (D. Md. Mar. 28, 2019) (noting that a "review of the record demonstrates that the ALJ properly credited the Parents' expert witnesses based on their qualifications"); *L.R. v. Bellflower Unified Sch. Dist.*, No. 11-06396, 2012 WL 2501054, at *7 (C.D. Cal. June 27, 2012) (affirming an administrative law judge's decision based, in part, on a finding that he "thoroughly considered the qualifications of each expert").

Here, Plaintiffs' challenge to the ALJ's acceptance of Ms. Zona as an expert in the area of learning disabilities falls woefully short. Indeed, Plaintiffs argue simply that Ms. Zona is not qualified to be an expert witness in that area because she lacks a Ph.D. They provide no support, however, for the proposition that a witness must have a Ph.D., or any other specific level of education, to be considered an expert in the area of learning disabilities. To the contrary, the Third Circuit instructs that the qualification requirement should be interpreted liberally, and that "a broad range of knowledge, skills, and training qualify an expert as such." *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994)); *Thomas & Betts Corp. v. Richards Mfg. Co.*, 342 Fed.Appx. 754, 760–61 (3d Cir. 2009). In that connection, an independent review of Ms. Zona's educational background, training, and experience supports the ALJ's decision to accept her as expert. Ms. Zona testified that she has been in education, specifically special education, for approximately twenty years. (October 16, 2019 Hearing Transcript, 109:1 to 6.) Prior to starting her career, she received a bachelor's degree and a master's degree in special education with a concentration in learning disabilities. (*Id.* at 109:11 to 16.) Ms. Zona began her career as a special educator in a classroom

environment; then transitioned to the Child Study Team, and eventually assumed the role of Special Education Administrator. (*Id.* at 109:1 to 6.) Ms. Zona testified that she holds numerous certificates in the area of special education, including an Autism Specialist Certificate. Critically, she confirmed that she is a Nationally Certified Educational Diagnostician—a credential that took approximately five years to achieve—and she is trained to diagnose numerous learning disabilities. (*Id.* at 110:10 to 14.) Further, with respect to her experience and current role as Assistant Superintendent for Special Services, Ms. Zona testified that she oversees all special services in the District, the District's special education programming, special education budget, compliance with federal and state mandates in special education, and the evaluation of staff and other personnel in the special education department. (*Id.* at 110:15 to 21.) She further explained that she has experience conducting educational testing, that she is capable of reviewing and interpreting all assessments completed as part of a general Study Team Evaluation, and she has been specifically trained in methods for reading instruction, including Orton-Gillingham. (*Id.* at 111:2 to 15; 111:16 to 19; 111:24 to 112:6.) Finally, Ms. Zona testified that she has participated in "well over 1,000" special education eligibility determinations in the District—a figure that the ALJ and this Court find significant. (*Id.* at 112:11 to 17.) Accordingly, I find no basis to overturn the ALJ's qualification determination as to Ms. Zona.[6]

Turning to the ALJ's credibility determinations with respect to the testimony of Ms. Zona and Ms. Olson, Plaintiffs incorrectly suggest that the Court may make different credibility

---

[6]     Although Plaintiffs do not expressly challenge the qualifications of Ms. Olson, the Court also notes that the ALJ's acceptance of her as an expert was appropriate. In that connection, Ms. Olson testified that she has evaluated at least 400 students in her career for special education and related services, and that she has been trained in identifying the presence of a SLD. (October 15, 2019 Hearing Transcript, 158:11 to 13.) Ms. Olson also testified extensively about her experience and career in special education, the fact that she taught the District's preschool disabled classroom for eleven years, before also teaching a third and fourth grade special education class for one year. (*Id.* at 156:15 to 21.)

determinations and reject testimony outright without consideration of the ALJ's reasons or conclusions. When, as here, an ALJ has heard live testimony and determined that one witness is more credible than another witness, his determination is due special weight. *Shore Reg'l High Sch. Bd. of Educ.*, 381 F.3d at 199. It is well-settled that "this means that a District Court must accept the state agency's credibility determinations 'unless the non-testimonial, extrinsic evidence in the record would *justify* a contrary conclusion.' " *Id.* (quoting *Carlisle Area Sch.*, 62 F.3d at 529) (emphasis in original). In *Shore*, "the Third Circuit opined that in this context, the word "justify" requires that the applicable standard of review be essentially the same as that a federal appellate court applies when reviewing a trial court's findings of fact." *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d at 564 (citing *Shore Reg'l High Sch. Bd. of Educ.*, 381 F.3d at 199).

Here, Plaintiffs' credibility arguments on appeal fail because they are limited only to the testimony of Ms. Zona and Ms. Olson, without adducing any extrinsic evidence that call into question these witnesses' statements. *See New Milford Bd. of Educ. v. C.R.*, 09-328, 2010 WL 2571343, at *4 (D.N.J. June 22, 2010), *aff'd*, 431 Fed. Appx. 157 (3d Cir. 2011) (finding that a credibility argument based solely on the testimony of an opponent's witness plus cross examination did not justify rejecting the ALJ's determinations); *C.S. v. Montclair Bd. of Educ.*, 16-3294, 2017 WL 4122433, at *5 (D.N.J. Sept. 18, 2017). Because Plaintiffs' arguments as to Ms. Zona and Ms. Olson are solely based on testimonial evidence, there are no material facts that overcome the due deference afforded the ALJ's credibility determination, and as such, these credibility determinations stand.[7]

---

[7]     The Court also notes that based on a review of the record, the ALJ was correct in crediting the testimony of Ms. Zona and Ms. Olson. Ms. Zona testified definitively that under the New Jersey Administrative Code, a dyslexia diagnosis, alone, does not automatically entitle a student to special education services. She explained the importance of the UTAH Estimator in the assessment process, and also confirmed, despite dogged questioning from Plaintiffs' counsel, that the Utah Estimator does not impose an arbitrary cap as to the number of students eligible for special education in the District. As to Ms.

Plaintiffs also argue that the Court should "disregard" Ms. Brannigan's opinion because the District "failed to provide [her] with relevant materials and background information for her to evaluate [G.F.'s] academic progress." (Pl. Mov. Br., 36.) As noted by the District, however, Plaintiffs' argument is confusing because the ALJ found that Ms. Brannigan was <u>not</u> a credible witness. Specifically, the ALJ explained that she was a "nervous witness who often lost her train of thought or had a hard time gathering her thoughts." (ALJ Decision, 10.) He further stated that she was not an expert in dyslexia, not a doctor, and had "never issued a report diagnosing dyslexia or performed an educational evaluation for special education eligibility, or ever performed a psychological evaluation or done a comprehensive assessment." (*Id.*) The ALJ also acknowledged that Ms. Brannigan had not reviewed Dr. Kestler's report or other critical documents central to the underlying Eligibility Determination. (*Id.*) Thus, contrary to Plaintiffs' contention, there is no indication in the ALJ's decision that he relied on Ms. Brannigan's testimony to find that G.F. was not adversely impacted by a disability. Rather, as stated, *supra*, the ALJ relied on other testimonial and documentary evidence to reach that conclusion, including G.F.'s report cards, in-class observations of G.F., and information from G.F's teachers, and the results of the CST evaluations and Dr. Kestler's private evaluation.

Finally, Plaintiffs argue that the ALJ wrongly discredited the testimony of Dr. Kestler by not accepting her as an expert witness in dyslexia. (Pl. Mov. Br., 40-41.) The ALJ found that Dr. Kestler could only testify as a fact witness because Plaintiffs failed to provide notice of Dr.

---

Olson, she testified regarding the intricacies and nuances of the educational evaluation performed by the CST on G.F. She also explained that there was no meaningful difference between G.F.'s scores and results obtained by the CST's evaluation and those noted in Dr. Kestler's report. In that regard, she testified convincingly that her educational evaluation of G.F. shows a student with certain strengths and weaknesses. And, while G.F. may have been weaker in the areas of reading and reading comprehension according to the testing metrics and observations of her teachers, the results of Ms. Olson's educational evaluation indicated that those weaknesses did not rise to the level of a SLD under N.J.A.C. § 6A:14-3.5(c).

Kestler's testimony, or provide a witness summary, prior to the due process hearing in violation of N.J.A.C 1:6A–10.1(c). (ALJ Decision, 2.) In terms of the ALJ's finding that Dr. Kestler lacked credibility, the ALJ noted that she was not trained in Orton-Gallagher, never worked at a school, never worked on a CST, and was not a certified reading specialist. (ALJ Decision, 11.) In addition, the ALJ underscored that although Dr. Kestler testified that G.F. had a family history of dyslexia, she later revealed that the family members were great-uncles and second cousins -- not immediate family members. (*Id.*) The ALJ also stressed that Dr. Kestler never witnessed G.F. in a class situation, had no data from which to compare G.F. to her non-dyslexic peers, and questioned why Dr. Kestler administered the Wechsler Abbreviated Test to G.F. in the first place, since she testified that the test should not be used to determine dyslexia. (*Id.*) Lastly, the ALJ noted that her report provided no conclusion or recommendation that G.F. should be found eligible for special education and related services. (*Id.*)

Before addressing the ALJ's credibility determination as to Dr. Kestler, Plaintiffs first appear to challenge, albeit not expressly, the ALJ's decision to only permit Dr. Kestler to provide fact testimony. Although Plaintiffs' briefing alludes to the fact that the ALJ's decision, in this regard, was based on Dr. Kestler's qualifications, a closer examination of the record reveals that the ALJ barred Dr. Kestler's expert testimony based on Plaintiffs' failure to provide notice of her testimony and witness summaries in violation of New Jersey's five day rule, N.J.A.C. 1:6A–10.1(c). Indeed, the five-day rule states that evidence to be used at a hearing must be disclosed to the opposing party five days prior to the hearing. *See* N.J.A.C. 1:6A–10.1(c); *L.J. v. Audubon Bd. of Educ.*, No. 06-5350, 2008 WL 4276908, at *5 (D.N.J. Sept. 10, 2008) (applying the five-day rule to a due process hearing). The most obvious purpose of the five-day rule under New Jersey and federal law is to prevent litigants from having to defend against undisclosed evidence produced

25

at the last minute in administrative proceedings. *See Schoenbach v. District of Columbia*, No. 05–1591, 2006 WL 1663426, at *6 (D.D.C. June 12, 2006). That is, the rule puts parties in IDEA administrative proceedings on notice as to precisely what must be disclosed ("any evidence at [a] hearing") and when ("at least five business days before the hearing"), and reduces the likelihood that a hearing would have to be delayed or adjourned on account of disputes or confusion over a party's disclosure obligations. N.J.A.C 1:6A–10.1(c). "In light of the five-day rule's 'plain language,' courts faced with challenges to decisions by administrative law judges excluding evidence under the rule have 'consistently upheld the ALJ determinations.'" *L.J.*, No. 06-5350, 2008 WL 4276908, at *5 (citing *Pachl ex rel. Pachl v. School Bd. of Independent School Dist.*, No. 11, No. 02–4065, 2005 WL 428587, at *18 (D. Minn. Feb. 23, 2005)) (noting that the "plain language of [34 C.F.R. § 303.422(b)(3) ] provides a party the right to exclude evidence not disclosed to a party at least five business days before the hearing. This right is not curtailed in the event of a continuance") (citations omitted); *see also Schoenbach*, No. 05–1591, 2006 WL 1663426, at *6; *cf. J.T. ex rel. A.T. v. Medford Bd. of Educ.*, 118 Fed. Appx. 605, 607 (3d Cir. 2004) ("there is no basis to reverse the decision of [the] ALJ ... It should be noted that Appellants' counsel has never explained his reasons for not complying with Appellees' request to identify witnesses to be called at the ... hearing"). The Court does not find that a different outcome is warranted here. Indeed, Plaintiffs do not argue that they provided notice of Dr. Kestler's testimony, nor do they argue that the ALJ's sanction for their violation of the five-day rule was somehow inappropriate or impermissible.

Further, with respect to the ALJ's credibility determination, Plaintiffs again offer no extrinsic evidence to support their contention that the ALJ erred in finding Dr. Kestler to not be a credible witness. Rather, Plaintiffs merely argue, in conclusory fashion, that Dr. Kestler "has the

professional knowledge and experience to diagnose G.F. as having dyslexia and should have been accepted by the Administrative Law Judge as an expert in dyslexia." Like Plaintiffs' arguments as to Ms. Zona and Ms. Olson, this is insufficient to overturn the ALJ's credibility determination.[8]

### C.     Post Hoc Documents Relevant to Whether G.F. Had a Disability

Notwithstanding the Court's finding that the ALJ's decision was correct based on the record before him, I must determine whether certain documents related to the District's finding that G.F. was eligible for special education for the 2020-2021 school year should be considered. The record in this case was closed on February 10, 2021, but was reopened on April 14, 2021, to allow Plaintiffs to file a motion to reopen the record. That motion was denied on June 4, 2021, and the record was closed again on June 14, 2021. Specifically, Plaintiffs sought to admit seven documents into the record, including the evaluation plan developed for G.F. in 2020; Educational, Psychological, Social and Occupational Therapy assessments of G.F. prepared in 2021 in response to her third-grade teacher's request for an evaluation; and the IEP for G.F. from 2021. In short, these documents support the District's determination—made two years after their denial of special education and related services—that G.F. is eligible for special education and related services from March 2021 through March 2022.

Here, the ALJ did not err in denying Plaintiffs' motion to reopen the record. N.J.A.C. 1:1–18.5(c) provides that "[m]otions to reopen the record before an initial decision is filed must be addressed to the judge and may be granted only for extraordinary circumstances." Based on the parties' representations in their briefing, it appears that Plaintiffs' lone argument in support of their

---

[8]     Even if the Court were to credit Dr. Kestler's opinion that G.F. had dyslexia, the ALJ's conclusion regarding the District's Eligibility Determination would not change. As explained above, *infra*, the presence of a disability, alone, does not mean a child is necessarily eligible for special education and related services. Here, the evidence in the record did not show that G.F. was adversely affected by a disability, nor did it demonstrate that she needed special education.

motion to reopen the record was that the documents were relevant to Plaintiffs' purported disability. Plaintiffs do not provide any legal support, however, for the proposition that mere relevancy constitutes extraordinary circumstances. Moreover, even if relevancy, alone, could satisfy the extraordinary circumstances standard required to reopen the record, I do not find the *post hoc* documents at issue relevant. Critically, the *post hoc* documents were created more than two years after the District's evaluation of G.F. and, more importantly, Plaintiffs point to no evidence—either in the record or in the *post hoc* documents—to show that because G.F. was deemed eligible for special education services in 2020-2021, she also must have been eligible for special education services during the 2018-2019 school year. Put another way, the *post hoc* documents do not establish that G.F. had a qualifying disability under N.J.A.C. 6A:14-3.5(c) during the District's evaluation in 2018. The evaluations referenced in the *post hoc* documents— the evaluations that gave rise to the District's finding that G.F. was eligible for special education services for the 2020-2021 school year—occurred in 2020. Because these evaluations occurred in 2020, not 2018, Plaintiffs would need to establish some connection between G.F.'s SLD in 2020 and the evaluations performed in 2018 to show that G.F. also suffered from a SLD at the time of the District's initial Eligibility Determination. Plaintiffs do not make that connection, and without it, the *post hoc* documents simply cannot be relevant.

Rather, Plaintiffs' only argument as to the relevancy of these additional documents is that they prove that G.F. was not progressing in her core education, *i.e.*, the documents demonstrate an adverse impact on educational performance. Plaintiffs fail, however, to demonstrate that the *post hoc* documents satisfy the first prong of N.J.A.C. 6A:14-3.5(c), which requires the presence of a qualifying disability. In that regard, the *post hoc* documents do not show that under the severe discrepancy methodology employed by the District, that G.F. had a specific learning disability

during its evaluation period. Indeed, as discussed above, *infra*, "[t]he Third Circuit has noted that the IDEA is written in the <u>conjunctive</u> and coverage thereunder requires a showing that a student is 1) a child with a disability and 2) needs special education and related services." *J.Q. v. Wash. Twp. Sch. Dist.*, 92 F. Supp. 3d 241, 246 (D.N.J. 2015) (quoting *D.S. v. Neptune Twp. Bd. of Educ.*, 264 F. App'x at 189 ("Written in the conjunctive, the statute should not be read to protect children with an impairment but not requiring special education.")). Accordingly, even if the *post hoc* documents could be used to show that G.F. was not progressing in her core education, they do not establish that she had a qualifying SLD at the time of the District's evaluation and eligibility determination. Therefore, the *post hoc* documents would not impact the ALJ's conclusion that G.F. did not meet the criteria required for special education and related services eligibility in 2018-2019.

Further, notwithstanding the ALJ's denial of Plaintiffs' motion to supplement the record, I note that a party may seek to supplement the record with additional evidence when challenging the outcome of a due process hearing in a federal district court. *See* 20 U.S.C. § 1415(i)(2)(C)(ii). But a district court has discretion to exclude evidence that is irrelevant, cumulative, or otherwise unhelpful. *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 253 (3d Cir. 2012) ("[T]he court need not consider evidence that is irrelevant or cumulative ...." (citation omitted)); *see also Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 760 (3d Cir. 1995) ("While a district court appropriately may exclude [*post hoc*] evidence, a court must exercise particularized discretion in its rulings so that it will consider evidence relevant, non-cumulative and useful in determining whether Congress' goal has been reached for the child involved."). Although Plaintiffs did not move to supplement the record to include the *post hoc* documents pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii), even if they had, such an application would be denied for the same reasons as stated above—lack of relevancy.

IV.    **<u>CONCLUSION</u>**

For the reasons set forth above, the District's Motion for Summary Judgment is **GRANTED**, and Plaintiffs' Motion for Summary Judgment is **DENIED**.


Dated: September 20, 2022                              <u>/s/ Freda L. Wolfson</u>
                                                       Freda L. Wolfson
                                                       U.S. Chief District Judge